**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DORE & ASSOCIATES CONTRACTING, INC., an Indiana corporation, | ) ) ) | |
| Plaintiff /Counter-Defendant, | ) ) | No. 15 C 6221 |
| v. | ) ) | Hon. Virginia M. Kendall |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 150, | ) ) ) | |
| Defendant /Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Dore and Associates Contracting, Inc. ("DAC") brought a declaratory judgment action against International Union of Operating Engineers, Local Union No. 150 ("Local 150") pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. (Dkt. 1 ¶ 3.) The dispute stems from a 1974 Collective Bargaining Agreement ("CBA") between Local 150 and Dore Wrecking Company ("DWC"), a now-defunct company that was owned and operated by DAC's majority owner, Arthur P. Dore. Local 150 claims that DAC is a successor to DWC and is thus subject to DAC's obligations under the CBA. Claiming that DWC did not comply with the CBA by recruiting workers without following the referral process dictated by the CBA and not paying full union wages, Local 150 filed a complaint with the Union's arbitrator, the Joint Grievance Committee ("JGC"). (Dkt. 70-14 at 3.) Following deliberations, the JGC found that DAC was subject to the CBA as a successor to DWC. (Def. SOF ¶ 65.)[1] The JGC further determined that DAC violated the CBA and therefore ordered DAC to pay Local 150

---

[1] The Court uses the following abbreviations throughout this opinion. "Pl. SOF" refers to Dkt. 64, DAC's 56.1 Statement of Facts. "Pl. Resp." refers to Dkt. 81, DAC's response to Local 150's 56.1 Statement of Facts. "Def. SOF" refers to Dkt. 70, Local 150's 56.1 Statement of Facts. "Def. Resp." refers to Dkt. 83, Local 150's response to Dore's 56.1 Statement of Facts.

$114,887.25. (*Id.*) Refusing to make this payment, DAC argues that it has always been a distinct entity from DWC and is not subject to the CBA or any ruling of the JGC. (Dkt. 1 ¶¶ 24–26.)

DAC filed the instant complaint seeking a declaratory judgment that the CBA is unenforceable and void as to DAC (*Id.* ¶ 27) as well as an injunction prohibiting Local 150 from enforcing the grievance award. (*Id.* ¶ 34.) Local 150 responded by filing a counterclaim seeking enforcement of the JGC award. (Dkt. 13 ¶ 11.)

DAC now moves for summary judgment, arguing that the JGC erred by determining it is a successor of DWC subject to the CBA. In the alternative, it argues that the Court should rule in its favor based on affirmative defenses under the doctrine of laches and Illinois's statute of repose. DAC also moves for sanctions under Federal Rule of Civil Procedure 37, claiming that Local 150 attempted to present "newly discovered facts" after the close of discovery in violation of Federal Rule of Civil Procedure 26(a). Local 150 cross-filed its own motion for summary judgment requesting that the Court declare that, as DWC's successor, DAC is subject to the CBA and the JGC's ruling.

For the reasons set forth below, the Court denies both parties' Motions for Summary Judgment [65; 67]. DAC's Motion for Sanctions [63] is also denied.

## FACTS

Both parties argue that the other party's statement of facts violates Local Rule 56.1. DAC claims that Local 150 submitted more than eighty statements of fact in violation of the Rule and that their L.R. 56.1 Statement included legal conclusions masquerading as facts. (Dkt. 81 at 2.) It also argues that several of Local 150's facts rely on inadmissible hearsay such as newspaper articles and meeting minutes.

First, Local 150 could have been more succinct in its description of the facts. DAC is also correct that Local 150's Statement of Additional Facts (Dkt. 83) presents almost no "additional" facts, but instead repeats verbatim (or slightly reworded) many of the same facts that it included in its original Statement of Facts. (Dkt. 70.) As a result, the Court disregards Local 150's Statement of Additional Facts to the extent that it presents any reworded facts that were already presented in its Statement of Facts. Second, the Court ignores any legal conclusions set forth in Local 150's 56.1 Statement of Facts, such as a description of DAC as DWC's successor. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 381 n.2 (7th Cir. 2008) (affirming the district court's decision to strike exhibits where a party had violated Local Rule 56.1 by including legal conclusions in its statement of facts). Third, DAC is correct that some of Local 150's facts rely solely on newspaper articles. Where Local 150 cites these articles for the truth of the matter asserted, they constitute inadmissible hearsay, *Taylor v. City of Chicago*, No. 14 C 737, 2015 WL 6561437, at *12 (N.D. Ill. Oct 29, 2015) (citing *Mayor of Phila. v. Educ. Equality League*, 415 U.S. 605, 617–18 & n.15 (1974), which the Court will disregard.[2] However, facts based on meeting minutes are not necessarily hearsay. Meeting minutes, like minutes from the South Bend Redevelopment Commission are admissible because minutes were regularly taken at those meetings, as evidenced by the document heading. *See Wielgus v. Ryobi Tech, Inc.*, No. 08 CV 1597, 2012 WL 2277851 (N.D. Ill. June 18, 2012) (minutes are admissible if they are regularly taken and carry a level of trustworthiness). Some of DAC's evidentiary objections are without merit, including its assertion that paragraph thirty of Local 150's Statement of Facts relies heavily on newspaper articles when in fact the entire paragraph is supported by deposition testimony.

---

[2] The following statements are therefore disregarded as inadmissible hearsay because they are based solely on newspaper reports: 1) "DWC was performing work until at least late-December of 1978" (Dkt. 70 ¶ 3), and 2) "[DWC's] customers included . . . Bay City, Michigan." (*Id.* ¶ 9.)

Local 150 responds with its own objections to DAC's Statement of Facts, all of which are without merit. Local 150 claims that several paragraphs in DAC's Statement of Facts are not supported by their citations to the record. (Dkt. 82 at 4.) The Court has reviewed each of these, and they are in fact directly supported by the record. DAC is quite right that "[i]f Local 150 is going to accuse a party of violating a rule, then it should first review and ensure that it did not violate the same rule." (Dkt. 84 at 14.) Having dispensed with the above evidentiary objections, the following facts are undisputed unless otherwise indicated.

## A. Dore Wrecking Company and the Collective Bargaining Agreement

In 1958, Arthur P. Dore started a business that specialized in demolition. (Pl. Resp. ¶ 1.) In 1966, Dore incorporated his business in Michigan as Dore Wrecking Company. (Pl. SOF ¶¶ 7–8.) (*Id.* ¶ 7.) Dore was the sole shareholder of DWC and was in charge of its operations and management. (Pl. SOF ¶ 9.) At various times throughout DWC's existence, the following people played roles in the company: Donald Rynek served as Vice President; Edward Siebert, Sr. served as a Registered Agent; Frank Polasky was the keeper of records, accountant, and lawyer; and Rickey Lutterbach was employed there in some capacity for two or three years beginning in 1974. (Def. SOF ¶¶ 4, 8; Pl. Resp. ¶ 4; Pl. SOF ¶ 20.) Lutterbach submitted the annual reports on behalf of DWC, and Dore and Lutterbach both signed corporate documents on behalf of DWC. (Def. SOF ¶ 5.) DWC's most recent business address was 900 Patterson St., Bay City, Michigan and its mailing address was P.O. Box 146, also in Bay City. (*Id.* ¶ 7.)

Local 150 is a labor organization that represents employees in parts of Illinois, Iowa, and Indiana. (Def. Resp. ¶ 2.) Throughout the 1960s and 1970s, DWC entered various agreements with Local 150. For example, in 1965, 1968, and 1969, DWC executed memoranda of agreement with Local 150. (Def. SOF ¶¶ 13–16.) In September 1965, Dore signed a $2,500 bond related to

a contract employing Local 150 members. (*Id.* ¶ 14.) And in 1974, DWC signed another memorandum of agreement ("the Agreement"), binding it, and its successors and assigns, to the Mid-America Regional Bargaining Association Heavy & Highway Agreement, the CBA. (Pl. SOF ¶ 19; Def. SOF ¶ 17.)

At some point in the 1970s, DWC began having financial issues and was unable to pay its creditors. (Pl. SOF ¶¶ 21–22.) As a result, DAC claims that DWC abandoned some of its equipment and ceased operations, but the parties dispute when and to what extent this happened. (*Id.* ¶ 23.) Dore himself could not state with any specificity when DWC went inactive. (Dkt. 64, Ex. 3 at 23.) At some point near the end of DWC's operation, or immediately thereafter, Dore worked in the boxing business, operating "Toughman" contests. (Pl. SOF ¶ 24.) Dore believes he began doing this in 1979. (Dkt. 65, Tab 3 at 88.)

### B. Siebert & Associates Contracting

In 1976, Rickey Lutterbach and Ed Siebert, Sr. founded Siebert & Associates Contracting, Inc. ("SAC") in Indiana and incorporated there that same year. (*Id.* ¶ 26.) Frank Polasky, the keeper of records, accountant, and lawyer for DWC, filed SAC's Articles of Incorporation. (Def. SOF ¶ 20.) At some point between the time of SAC's incorporation and 1978, Dore purchased shares of SAC. (Pl. SOF ¶ 28.) Shortly thereafter, he become the sole stockholder in SAC, acquiring the excavators and other demolition equipment that were owned by SAC. (*Id.* ¶ 29.) Although SAC's annual filings for 1976 and 1977 do not list Dore as an officer of the company, he was listed as the chairman of SAC's board on its December 5, 1978 filing. (Pl. SOF ¶¶ 31, 32.) On December 27, 1978, likely before Dore began running "Toughman" contests, SAC changed its name to Dore & Associates Contracting, Inc. (*Id.* ¶ 30.) When asked how much time passed between the time that DWC stopped operating and when he

took over SAC, he responded, "I think it was a while, and I don't know how long that was." (Dkt. 65, Tab 3 at 89.)

## C. Comparison Between DWC and DAC

Despite having ceased operations at some point in the mid-to-late 1970s, DWC was not formally dissolved until 1981. (Pl. SOF ¶ 35.) During that same year, DAC filed for Chapter 11 bankruptcy but was discharged in 1986. (*Id.* ¶36.) DAC continues to operate to this day. (Def. SOF ¶ 38.) Before selling shares in DAC to his children, Dore owned all of DAC's stock, just as he was the sole owner of DWC. (Def. SOF ¶ 22; PL. SOF ¶ 9.)

DAC and DWC have several important similarities and differences. For example, the companies used different insurance companies; DAC used Insurance of America, Meadowbrook, and Roger Imperial, and DWC used Harden Agency. (Pl. Sof. ¶ 37.) DAC has been a customer at Chemical Bank since 1983 (*Id.* ¶ 38), but Dore could not recall which bank DWC used. (Dkt. 70, Tab 3 at 42.) Whereas DWC rented most of its equipment and abandoned some of the equipment that it did own, DAC has mostly bought its equipment and only rents equipment on occasion. (Def. SOF ¶ 34.) DAC uses the same mailing address that DWC did: P.O. Box 146, Bay City, Michigan.[3] (*Id.* ¶ 29.) Both DWC and DAC were headquartered in Bay City and had satellite offices in Chicago and Detroit. (*Id.* ¶¶ 7, 12, 38). As he did with SAC, Frank Polasky worked as the keeper of records, registered agent, lawyer, and accountant for DAC and DWC, even preparing the Articles of Incorporation for SAC while still performing services for DWC. (*Id.* ¶ 32; Pl. Resp. ¶ 32.) Rickey Lutterbach and Edward Siebert, Sr. also did work for both companies. (Def. SOF ¶¶ 5, 12, 23 24). Like he did for DWC, Rickey Lutterbach submitted annual reports on behalf of both SAC and DAC and signed corporate documents. (Def. SOF ¶

---

[3] It is undisputed that DAC and DWC used the same mailing address. It is disputed, however, whether they operated out of the same physical address.

24.) Both companies performed the same work: demolition, which they performed for some of the same customers including the city of South Bend, Indiana, the St. Louis Housing Authority, the Federal Government, and General Motors. (*Id.* ¶¶ 9, 30).[4]

Although DAC was founded in December 1978, the company's website states the following: "Welcome to Dore & Associates Contracting, Inc., a Michigan-based national demolition, abatement and remediation contracting firm that has completed over 50,000 projects since its beginnings in 1958," the year during which Dore began working in demolition. (Def. SOF ¶ 35.) In 2001, while under oath during a Michigan Tax Tribunal Hearing, Dore responded to a question about the status of DWC by saying, "Dore Wrecking is now Dore and Associates Contracting." (*Id.* ¶ 38.) When asked whether "it's safe to say then you've essentially continued DWC," Dore responded by saying "[y]es, I have." (*Id.*) Dore appealed the Michigan Tax Tribunal's ruling in that case, but did not appeal the portion that read "Dore Wrecking became Dore & Associates Contracting, Inc." (*Id.* ¶ 40.) As of July 19, 2016, DAC had a truck door displayed in the lobby of its headquarters with the DWC logo on it. (*Id.* ¶ 41.)[5]

When asked to identify the differences between DWC, SAC, and DAC, Dore said that there were probably no differences other than: 1) they were separate corporate entities, 2) DAC did more asbestos abatement (but agreed this may have only been so because asbestos only became a major issue more recently), and 3) DWC "went broke" whereas DAC continues to operate. (Def. SOF ¶ 44; Pl. Resp. ¶ 44.)

---

[4] That these entities were customers of both DWC and DAC is supported by admissible deposition testimony not just hearsay.
[5] DAC claims that this door is merely Dore's personal memento from which no inference of DAC and DWC's interrelation can be drawn. (Dkt. 84 at 11 n. 14).

### D. The Joint Grievance Committee

DAC performed several jobs within Local 150's jurisdiction between 2011 and 2014. (Pl. SOF ¶ 40–46.) In late 2014, Local 150's business agent, Charles August, noticed that DAC demolished the Brainerd Building in Libertyville, Illinois, which was located in Local 150's jurisdiction. (Def. SOF ¶ 46.) August discovered that DAC was not using Local 150 operators to perform that job (*Id.* ¶ 47), so he investigated DAC's relationship with DWC because he recalled a Dore company from a previous project in Indiana. (*Id.* ¶ 47.) Mr. August then learned about the CBA signed by DWC. (*Id.* ¶ 50.)

Following August's investigation, Local 150 filed a grievance on January 7, 2015, with the JGC pursuant to the CBA. (Def. Resp. ¶ 47.) The grievance focused on DAC's "fail[ure] to obtain employees through the referral offices of Local Union 150 and pay proper wages and fringe benefits" in accordance with the Agreement signed by DWC. (*Id.*) DAC responded by letter on January 8, 2015, claiming that DAC was not a successor entity to DWC and thus not a signatory to any agreements with Local 150. (Pl. SOF ¶ 48.) The JGC eventually notified DAC in a letter dated February 27, 2015 that a grievance hearing would be held on March 20, 2015. (*Id.* ¶ 49.) DAC responded, reiterating that it was not a signatory to the Agreement, again said it was not a successor to DWC, and provided documents from the Michigan Department of Licensing and Regulatory Affairs that it argues show that DAC and DWC are separate entities. (*Id.* ¶ 50.) At the July 8, 2015 grievance hearing, which DAC did not attend (Def. SOF ¶ 62), Local 150 presented the following as evidence of DAC's violation: letters and documents from January 7, 2015 to March 16, 2015, the Agreement, the CBA, grievance wage calculations, a foreman list, business cards, two sets of job site pictures, and grievance file documents.[6] (*Id.* ¶ 51.) The JGC ruled that DAC was the successor or alter-ego of DWC and issued a $114,887.25

---

[6] As described below, DAC objects to the JGC's use of this evidence.

award to Local 150 for DAC's "fail[ure] to obtain employees through the referral offices of Local Union 150 and pay proper wages and fringe benefits in accordance with [the] Agreement" for various jobs between December 2014 and March 2015 in Local 150's territory. (*Id*. ¶ 65); (Dkt. 70-13); (Dkt. 70-14.)

## STANDARD OF REVIEW

On cross-motions for summary judgment, each movant must satisfy the requirements of Rule 56 of the Federal Rules of Civil Procedure. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law." *Hampton v. Motor Ford Co*., 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). On cross-motions for summary judgment, the Court draws inferences in favor "of the party against whom the motion under consideration was made." *Vulcan Const. Materials, L.P. v. Int'l Union of Operating Eng'rs*, No. 09 C 1724, 2009 WL 5251889, at *4 (N.D. Ill. Nov. 25, 2009) (citing *First State Bank v. Ohio Cas. Ins. Co*., 555 F.3d 564, 567 (7th Cir. 2009).

The Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. *See Trapaga v. Cent. States Joint Bd. Local 10*, 05 C 5742,

2007 WL 1017855 (N.D. Ill. 2007) (quoting *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'"). A party that fails to comply with Local Rule 56.1 may suffer a denial as a result. N.D. Ill. L.R. 56.1(a)(3).

## DISCUSSION

Each party argues that the Court should grant summary judgment based on its own view of the evidence describing the relationship between DWC and DAC. DAC argues that the record is clear that it is not a successor or alter-ego of DWC, and that DWC and DAC do not constitute a single employer. Additionally, DAC argues that the JGC's ruling was without merit. Local 150, on the other hand, argues that DAC assumed DWC's labor obligations, was a successor-in-interest, is an alter-ego of DWC, and that DWC and DAC constitute a single employer. The Court addresses DAC's argument about the merits of the JGC before addressing both parties' successorship theories. Then, the Court addresses DAC's two affirmative defenses under the doctrine of laches and the statute of repose, respectively.

As set forth below, there is a genuine dispute of material fact as to whether DAC is bound by the CBA, and DAC has failed to establish any affirmative defense. Accordingly, the Court denies both motions for summary judgment.

## I. Challenging the JGC's Ruling on the Merits

Courts are highly deferential to joint grievance committees' rulings. *Ganton Techs., Inc. v. UAW, Local 627*, 358 F.3d 459, 462 (7th Cir. 2004). The Court does not consider errors made in a union's grievance committee's reasoning or process. *See Merryman Excavation, Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 639 F.3d 286, 293 (7th Cir. 2011) (holding that courts

should not review a joint grievance committee's decision when parties' CBA provides a committee with plenary power to resolve disputes); *Ganton Techs*, 358 F.3d at 462 ("the role of the reviewing court is to determine whether the arbitrator's award draws its essence from the collective bargaining agreement"). "As long as the parties agreed that [a grievance's committee's procedures and determinations] would be binding, it is 'not open to the courts to reweigh the merits of the grievance.'" *Adeline Sand & Gravel, LLC,* 09 CV 7594, 2013 WL 3455763, at *3 (N.D. Ill. July 2, 2013) (quoting *Merryman Excavation, Inc.*, 639 F.3d 286, 289 (7th Cir. 2011). Absent evidence that a party's interests are not properly represented on the committee's voting panel, "the joint committee's decision is binding and not subject to appeal." *Merryman Excavation, Inc.*, 639 F.3d at 293. Additionally, failure to raise an argument before a joint grievance committee "waives that argument in collateral proceedings to enforce or vacate the arbitration award." *Ganton Techs*, 358 F.3d at 462.

DAC argues that the Court should overturn the JGC's award because the evidence presented by Local 150 to the JGC on which it based its ruling was "conjecture, hearsay, and unsupportable self-serving conclusions." (Dkt. 65 at 8.) Fundamentally, this a challenge to the means by which the JGC came to its determination in this matter. Reviewing the deliberative processes of the JGC is not within the Court's purview—doing so would slow down the swift adjudicative process that arbitration is intended to provide. *See Anheuser-Busch, Inc. v. Beer Workers Local Union 744*, 280 F.3d 1133 (7th Cir. 2002) (explaining that "one purpose of arbitration is to provide parties with swift, inexpensive, and final decisions.") Because this argument is premised on the substance of the JGC's decisions and the adjudicative procedures it employed, and not whether the JGC is a decision-maker to which DAC has agreed to subject

itself, it is not proper for this Court to entertain. Accordingly, the only issue properly before the Court is whether DAC is subject to the CBA and thereby the JGC's ruling.

## II. Successorship Theories

The general common-law rule is that one corporation is not liable for the debts of another, even where one corporation has purchased the assets of the other. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd*, 419 F.3d 594, 989–99 (7th Cir. 2005). In this context, there are four exceptions to this rule, any of which can bind a successor to its predecessor's obligations: 1) the second company expressly or implicitly assumed the collective bargaining obligations of the first company (*Travis v. Harris Corp*., 565 F.2d 443, 446 (7th Cir. 1977)); 2) the second company is a successor or mere continuation of the first (*Chi. Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc*, 59 F.3d 48, 49 (7th Cir. 1995)); 3) the two companies constitute a single employer (*Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998)); 4) the second company is an alter ego of the first. *Int'l Union of Operating Eng'rs, Local 150 v. Rabine*, 161 F.3d 427 (7th Cir. 1998). If DAC bound itself to the DWC's obligations under any of these exceptions, then it will be liable for the award that the JGC issued in Local 150's favor. Local 150 argues that, as a matter of law, all four exceptions are applicable to this instant matter. (Dkt. 72.) DAC argues just the opposite. (Dkt. 80.) Accordingly, the Court addresses each exception in turn.

### A. DAC Assumption of DWC's Obligations

Under the assumption theory of successor liability, a successor is responsible for the obligations of its predecessor if the successor expressly or implicitly bound itself to those obligations. *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 255 (1974). In *Howard Johnson*, the Court held that a company that purchased another company was not bound

by its predecessor's union arbitration agreement because it made no express or implied assumption. In that case, the purchasing company explicitly refused to bind itself to its predecessor's collective bargaining agreement. *Id.* at 251–52. The Court suggested that a company could implicitly bind itself to its predecessor's collective bargaining agreement if it kept all the same employees that its union-employer predecessor had, but determined that was not the case there. *Id.* at 264.

In the instant matter, DWC signed the Agreement by which it expressly bound itself and its "successors and assigns" to the CBA. If DAC is indeed DWC's successor, then DAC is bound by the CBA because by acting as the successor to a company that imposed that obligation on its successor, the successor implicitly accepts that obligation. *See Int'l Union of Operating Eng'rs v. Centor Contractors, Inc.*, 831 F.2d 1309, 1313 n.3 (7th Cir. 1987) (noting that predecessor's adoption of a collective bargaining agreement to which it explicitly bound its successors and assigns tipped the balance in favor of finding liability under the assumption doctrine). Thus, whether DAC is bound to the CBA depends on whether it is a successor of DWC. As discussed below, based on the record before it, the Court is unable to make that determination as a matter of law.

**B. There is a Fact Dispute as to Whether DAC is DWC's Successor**

To determine whether one business is the successor of an earlier business for purposes of establishing successor liability, this Court looks to whether 1) the second business had notice of the earlier business's liabilities, and 2) whether there was substantial continuity between the operation of the two businesses. *Feinberg v. RM Acquisition,* LLC, 629 F.3d 671, 674 (7th Cir. 2011) (citing *E.E.O.C. v. G-K-G, Inc.,* 39 F.3d 740, 748 (7th Cir. 1994)); *Tasemkin, Inc*, 59 F.3d at 49. Although successorship doctrine traditionally applied only when assets were sold, it "is an

equitable doctrine, not an inflexible command," and as such it can arise in a wide variety of situations. *Chi. Truck Drivers*, 59 F.3d at 49 (quoting *Howard Johnson Co.*, 417 U.S. at 256). The successorship doctrine applies wherever there is a reorganization that results in a substantial continuation of the prior business by the successor and "either obliterates the previous business or leaves it as an empty shell." *Cent. States, Se. & Sw. Areas Pension Fund v. Tas Inv. Co.*, No. 11 C 2991, 2013 WL 1222042, at *7 (N.D. Ill. 2013.)

Having notice of the earlier company's liabilities requires actual knowledge, not merely that the latter company could have learned about the liabilities through due diligence. *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986) (refraining to impute knowledge of a liability to the defendant where doing so would require an act of "judicial surgery"); *see also Trs. of Chi. Plastering Inst. Pension Tr. v. Elite Plastering Co.*, 603 F. Supp.2d 1143 (N.D. Ill. 2009) (holding that no successor liability existed even though due diligence could have alerted the employer to its predecessor's liability because no proof of actual knowledge existed); *but see Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841 (7th Cir. 2015) (holding that sufficient notice existed for finding successor liability where the successor was aware that its predecessor was a union-affiliated employer).

In this case, DAC had actual knowledge, through Dore, of DWC's liabilities under the CBA before DAC began operating. Before DAC came into existence, DWC signed at least three different memoranda of agreement with Local 150; Dore himself signed a bond related to a contract employing Local 150 members. Dore, who stated that he was responsible for labor-related decisions for both DWC and DAC (Dkt. 80 at 6), purchased SAC and moved it, under the name DAC, to Bay City, Michigan. These undisputed facts indicate that the relevant individual

at DAC was necessarily on notice with respect to DWC's responsibility to Local 150 under the CBA, just as the business in *Tsareff* was on notice of its antecedent's status as a union-employer.

The second element of the successorship analysis, substantial continuity, exists where there are no major changes made in the operation of the businesses. Determining whether one company is the successor of another is primarily a factual endeavor that requires the Court to "focus on whether the new company has 'acquired substantial assets of its predecessor and continued without interruption or substantial change, the predecessor's business operations.'" *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27 (1987) (quoting *Golden St. Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 184 (1973). Factors indicating substantial continuity can include use of the same office, a similar workforce, the same supervisors, the same equipment, and provision of the same services. *N.L.R.B. v. Jarm Enters*. 785 F.2d 195, 200 (7th Cir. 1986).

Here, DWC and DAC performed the same type of service for some of the same customers, but DAC also worked for many new customers. It is also undisputed that DWC continued to exist as a legal entity at the time that Dore acquired SAC, renamed it DAC and began using DWC's old mailing address. *See Centor Contractors, Inc.*, 831 F.2d at 1313 (considering the use of the same address in its determination that the second company was subject to successor liability). They had similar leadership, including Dore at the helm, and Rickey Lutterbach and Frank Polasky performing high-level responsibilities for both companies. However, there is no indication in the record that DWC and DAC used a similar workforce below the management level, the parties dispute whether DAC and DWC operated out of the same location, and there is no evidence that DAC acquired any of the assets of DAC. On the other hand, Dore's own words describing the continuity between DWC and DAC are particularly illuminating: "Dore Wrecking is now Dore and Associates Contracting." (Def. SOF ¶ 35.)

In addition to the factors indicating substantial continuity being mixed, it is far from clear that the "without interruption" prong of the *Fall River* test is satisfied. Substantial continuity does not require that the two organizations operate without *any* temporal interruption. *See Fall River*, 482 U.S. at 45 (concluding that substantial continuity existed despite a seven-month gap between the operation of the two businesses); *Sullivan v. J.S. Sales Plumbing, Inc.*, No. 92 C 7393, 1994 WL 55658, at *7 (N.D. Ill. Feb. 23, 1994) (finding substantial continuity where a successor company and its predecessor never operated concurrently). More typically, however, courts find substantial continuity where there is no or a *de minimis* temporal discontinuity between the operation of the two companies. *See, e.g. Canteen Corp v. N.L.R.B.*, 103 F.3d 1355, 1359 (7th Cir. 1997) (affirming NLRB's finding of substantial continuity where there was no temporal break in the operation of the two businesses); *Cent. States, Se. & Sw. Areas Pension Fund v. Westway Motor Freight Inc.*, 99 C 4202, 2000 WL 1409825 at *6 n.6 (substantial continuity found where the two companies' operations overlapped temporally). Here, there is a factual dispute between the parties about the temporal discontinuity between the operation of DWC and DAC–it was at most a couple of years, and at the least, there was no gap. We know that DWC signed on to the CBA in 1974, that Rickey Lutterbach began working for DWC in 1974 and worked there for two or three years, that sometime in the mid-to-late 1970s, DWC became inactive, that Dore took over SAC in 1978,[7] and that Dore began working in the boxing business in the late-1970s, likely 1979. Thus, there may have been no temporal gap or there may have been a gap of a few years between DWC and DAC's operation.

When similar factual disputes exist regarding substantial continuity, courts within this district typically deny summary judgment. In *Tas Inv. Co.*, for example, the court determined

---

[7] It is undisputed that he became the owner of SAC and renamed it DAC in 1978, but it is disputed when he became in involved in SAC.

that insufficient indicia of continuity were present for a grant of summary judgment because the court did not have sufficient information regarding the extent to which the two businesses employed the same workforce, had the same customers, and whether the antecedent company had been in operation during the two years prior to the defendant-company's formation.

There are significant factual disputes or lack of evidence regarding many of the factors courts consider indicative of continuity, including use of the same physical address (although this is disputed), equipment, and workforce below the management level, and there is an unresolved temporal question similar to the one presented in *Tas Inv. Co*. Just as in *Tas Inv. Co.*, a sufficient number of the indicia of continuity are lacking such that this Court cannot make a determination as a matter of law on this issue. The record provides insufficient information regarding the timeline of Dore's active involvement in DWC, SAC, and DAC. The companies had other dissimilarities (e.g. equipment and insurance companies). Based on these differences and open questions, and given the fact-intensive nature of the substantial continuity test, there is a fact question as to whether DAC was or was not, as a matter of law, DWC's successor. *See Tas Inv. Co.*, 2013 WL 1222042, at *9 (concluding that neither side was entitled to summary judgment where there were disputes as to key facts that the Court must consider as part of its totality of the circumstances analysis.)

## C. DAC and DWC are not a Single Employer.

The single employer doctrine dictates that "'when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes.'" *Boudreau v. Gentile*, 646 F. Supp.2d 1016, 1021 (N.D. Ill. 2009) (quoting *Moriarty v. Svec*, 164 F.3d at 332). Accordingly, if the facts establish that DWC and DAC are a single employer, then DAC is obligated to pay the JGC award and follow the terms of the CBA under which the award was imposed. *See Moriarty v.*

*Svec*, 164 F.3d at 334 ("Once the court found that [two entities] were a single employer . . . it could impose liability in accordance with the terms and conditions of [the CBA]) (citation omitted); *Bd. of Trs. of the Pipe Fitters Ret. Fund, Local 597 v. Am. Weathermakers, Inc.*, 150 F.Supp.3d 897, 905 (N.D. Ill. 2015) (holding that if two businesses are determined to be single employer, then both are equally liable under a CBA entered on behalf of only one of them).

To determine whether two nominally distinct entities are a single employer, the moving party must show that the two entities have: 1) common ownership, 2) common management, 3) interrelation of operations, and 4) centralized control of labor relations. *Lippert Tile Co. v. Int'l Union of Bricklayers and Allied Craftsmen, Dist. Council of Wis.*, 724 F.3d 939, 946 (7th Cir. 2013). No single factor is dispositive; instead, the court must conduct a fact-intensive inquiry and "weigh the totality of the circumstances." *Id* at 946–47. In *Lippert*, for example, the Court determined that three nominally distinct entities were a single employer even though the centralized control of labor relations factor leaned "slightly" in the companies' favor. *Id.* at 947–48; *see also Trs. of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 788 (7th Cir. 1993) (determining that, based on the totality of the circumstances, two entities were not a single employer even though three of the four factors were partially satisfied). In order for the single employer doctrine to apply, the entities must be sufficiently integrated that they operate as a "single interrelated enterprise;" essentially, they must operate together simultaneously. *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998).

Local 150 argues that DWC and DAC constitute a single employer because: 1) Dore owned both companies, 2) Dore, Lutterbach, Siebert, and Polasky all performed important managerial functions for both companies, 3) the two companies' operations were closely interrelated, and 4) Dore was in charge of labor relations for both companies. (Dkt. 72 at 4–8.) In

response, DAC argues that DAC and DWC are not a single employer because they did not operate simultaneously, and because their operation was interrupted by SAC, an entity owned and operated by different people. (Dkt. 80 at 2.) DAC also claims that the two companies had only minimal common management and that, even so, these common managers did not serve at the two companies simultaneously. (*See id.*) As described below, when viewing the totality of the circumstances, DAC and DWC are not, as a matter of law, a single employer.

### i. Common Ownership

It is undisputed that, at all times, Dore was the sole owner of DWC. He has also always been the owner and CEO of DAC. Thus, the common ownership element is satisfied.

### ii. Common Management

DAC concedes that at least some common management existed between the two companies, including Dore, Siebert, and Lutterbach. (Dkt. 80 at 5–6.) However, without providing any support in case law or otherwise, DAC contends that common management is not a factor here because none of the managers operated the two companies simultaneously. (*Id.*)

The common management factor requires an inquiry into managers' degree of actual control over day-to-day operations rather than just their formal job titles or potential control. *See Lippert Tile Co.*, 724 F.3d 939, 947 (7th Cir. 2013) (citing *Cimato Bros., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 17*, 352 NLRB 797, 799 (2008). In *Cimato*, for example, the NLRB ruled that common management did not exist despite the fact that the two entities involved had management that was nominally the same because the day-to-day operations of the two entities were run by different individuals. In the instant action, there is no evidence to suggest that the management of DAC and DWC were any different. Dore oversaw major decisions at DWC and DAC, including hiring and firing of employees, obtaining bonds and

bidding jobs. (Def. SOF ¶¶ 6, 28). Lutterbach also had important management roles at DWC and DAC, including submitting annual company reports. (*Id.* ¶¶ 5, 24); (Pl. Resp. ¶¶ 5, 24.) Additionally, Frank Polasky, a third party, served as the keeper of records, registered agent, lawyer, and accountant for both companies. (Def. SOF ¶ 32); (Pl. Resp. ¶ 32); *see Favia Elec. Co.,* 995 F.2d at 788 (determining that two businesses had separate management in part because they had different people paying their taxes and filing annual reports). Given the great deal of overlap between the two companies, the common management factor also weighs in Local 150's favor.

### iii. *Interrelation of Operations*

The third factor—interrelation of operations—is the most fact-intensive and looks to a number of variables to find operational similarities between technically distinct entities. *See Lippert Tile Co.*, 724 F.3d at 947 (performing the same type of work at the same time in the same geographic area, maintaining common business records and back accounts, and having the same supervisors is indicative of interrelated operations); *Favia Elec Co.*, 995 F.2d at 788 (having an identical workforce that works for both entities simultaneously is indicative of interrelated operations); *Rogers v. Sugar Tree Prods., Inc.*, 7 F.3d 577, 582 (7th Cir. 1993) (interrelation of operations is based on factors such simultaneous use of the same offices, common recordkeeping, shared bank accounts and equipment, and use of the same workforce). Based on the Court's review of case law on the single employer doctrine, inherent in the interrelation of operations prong is that the entities must operate simultaneously in order to be a single employer. *See, e.g., S. Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs, AFL-CIO*, 425 U.S. 800 (1976) (two wholly-owned subsidiaries of the same corporation that existed simultaneously constituted a single employer for collective bargaining purposes); *Lippert Tile*

*Co.*, 724 F.3d at 947 (three distinct entities that existed simultaneously constituted a single employer because their day-to-day operations were so integrated). Nor do any of the cases that Local 150 cites in support of its single employer argument including *Lippert*, *Favia,* and *Am. Weathermakers* suggest that two entities can be a single employer without operating simultaneously. Moreover, if two entities that did not exist simultaneously could be considered a single employer, it would create a redundancy in the law because the single employer test and the successor liability test would be indistinguishable.

Here, there is little evidence of interrelation of operations because there is no undisputed evidence of simultaneous operation. It is true that DWC and DAC have much in common including some of the same customers and the same mailing address. Both had offices in the same geographic areas, and DAC has employees that formerly worked for either SAC or DWC, but also has many employees that did not. However, they did not use the same equipment because DWC abandoned or returned its equipment before going out of operation, they never operated jointly on any projects, and they did not share bank accounts. Most importantly, while they technically existed as corporate forms simultaneously, it is undisputed that they never operated simultaneously.[8] While some indicia of interrelation of operations are present, the fact that DAC and DWC never operated simultaneously means they are not a "single integrated enterprise" as required by the single employer test.

Because interrelations of operations is a key factor in the single employer doctrine, there is a dispute of fact as to whether DAC and DWC are, as a matter of law, a single employer even though common ownership and management are satisfied. *See Favia Elec. Co.*, 995 F.2d at 788

---

[8] Local 150 claims that DWC continued operating until late-December, 1978, at approximately the same time that Dore took over SAC. (Def. SOF ¶ 3.) However, the only support for this claim is an article from 2002, which is inadmissible hearsay. Local 150 claims this is also supported by Dore' deposition (Dkt. 83 at 18–19), but it not. Dore stated that he could not remember when DWC's final job was completed. (Dkt. 83-4, 233–35.)

(two companies were not a single employer in part because they "did not demonstrate a high degree of interrelation of operations").

### D.  DAC is not DWC's Alter-Ego

If a successor company is, as a matter of law, an "alter ego" of its predecessor company, the "successor is liable and bound by the substantive provisions of the collective bargaining agreement signed by its predecessor." *Moriarty v. Consol. Funeral Servs., Inc.*, 65 F. Supp.2d 853, 861 n.15 (N.D. Ill. 1999). The alter ego analysis is like the single employer doctrine but with an additional element: an intent to avoid the employer's obligations under labor agreements. *See Centor Contractors, Inc.,* 831 F.2d at 1312 ("[T]he alter ego doctrine focuses on 'the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.") (citation omitted). A disguised continuance exists where one company shifted its operations to a new company in a fashion that constitutes a "'mere technical change in the structure or identity of the employing entity.'" *Anderson v. Liles*, 774 F. Supp.2d 902, 909–10 (quoting *Favia Elec. Co.*, 995 F.2d at 789). An element of unlawful motive or intent is critical to an alter-ego claim. *RKN Concrete Constr., Inc. v. Laborers' Pension Fund,* No. 13 C 9153, 2015 WL 1888513, at *8 (N.D. Ill. Apr. 24, 2015) (citing *Favia Elec. Co.*, 995 F.2d at 789).

Local 150 provides little evidence to support its claims that Dore intended to avoid his obligations under the CBA. It is nothing more than a conclusory allegation that Dore created DAC to escape DWC's liability under the CBA. (*See* Dkt. 72 at 9.) Given the dearth of evidence in support of this contention and the fact that Local 150 did not demonstrate that DAC and DWC were a single employer, the Court rejects, as a matter of law, the notion that DAC is the alter ego of DWC.

In short, the Court cannot determine at this stage of the litigation whether DAC is DWC's successor and thus whether it assumed DWC's obligations under the CBA. However, the Court can determine, as a matter of law, that DAC is not DWC's alter ego and the two companies do not constitute a single employer. Accordingly, we move on to DAC's affirmative defenses to assess whether summary judgment in DAC's favor is appropriate.

## III. Affirmative Defenses[9]

### A. Doctrine of Laches

DAC attempts to invoke two affirmative defenses, the first of which is that Local 150 failed to bring this claim consistent with the doctrine of laches. In order to make out an affirmative defense under the doctrine of laches, DAC must be able to show that: 1) Local 150 unreasonably delayed in asserting its rights under the CBA, and 2) Local 150's delay was prejudicial to DAC. *See Bd. of Trustees of the Pipe Fitters Ret. Fund, Local 597 v. Am. Weathermakers, Inc.,* 150 F. Supp.3d 897, 908 (N.D. Ill. 2015) (citing *Teamsters & Emp'rs Welfare Tr. of Ill. v. Gorman Bros. Ready Mix,* 283 F.3d 877, 880 (7th Cir. 2002)). An unreasonable delay occurs when the party knew, or reasonably could have known, about a cause of action and waited "too long" to act on it such that the opposing party was harmed by the delay. *Teamsters & Emp'rs Welfare Trust of Ill.,* 283 F.3d at 880. As with any affirmative defense, the party asserting an affirmative defense under the doctrine of laches bears the burden of proof. *Bauer v. J.B. Hunt Trans., Inc.,* 150 F.3d 759, 763 (7th Cir. 1998).

In support of this laches defense, DAC claims that Local 150 knew that DAC performed work within Local 150's jurisdiction in Hammond, Indiana in 2006 and thus could have sought

---

[9] Local 150 claims that Dore waived its affirmative defenses because it did not raise them at the JGC. *See Howsam v. Dean Witter Reynold, Inc.,* 537 U.S. 79, 85 (2002). However, Dore did not even attend the JGC, believing, as a reasonable jury could find, that it was not subject to the JGC's jurisdiction. Accordingly, the Court will address the affirmative defenses on the merits.

to enforce the CBA well before filing its grievance with the JGC in 2015. DAC further claims that Local 150's delay in bringing this action harmed DAC because relevant memories and documents "that would have assisted DAC in affirmatively establishing that it is a separate and unrelated entity to Dore Wrecking" have since been lost or destroyed. (Dkt. 65 at 5.) While DAC has thus stated the elements of a laches defense, the assertion that Local 150 knew or should have known that it had a claim in 2006 is conclusory and not supported by the evidence presented in the cited interrogatory answers (Dkt. 65, Ex. 1 at 9) or payroll records. (Dkt. 65, Ex. 2.) *See Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1002 (7th Cir. 1998) (mere conclusory allegations not supported by evidence do not present a genuine issue of material fact). The payroll records show that DAC performed a job in Hammond in 2006, but do not in any way indicate whether Local 150 was aware or should have been aware that DAC and DWC were related entities, much less that it could make out a claim against DAC for failing to comply with the requirements of the CBA. Simply showing that DAC performed a job in Local 150's jurisdiction, without showing some evidence that Local 150 was aware that DWC and DAC were related entities, is insufficient to support this affirmative defense under *Teamsters & Emp'rs Welfare Trust of Ill*.

DAC unsuccessfully attempts to analogize its case to *Zelazny*, a case in which the defendant was able to make out a successful laches defense because the plaintiff did not file suit for eight years after discovering the information necessary to file his claim. *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir. 1988). The only analogy between the two cases is an eight-year timeframe; in that case, there were eight years between the time of discovery of the action and the time of filing, and here Local 150 filed suit eight years after DAC performed a job in Hammond, Indiana without following CBA regulations. The plaintiff in *Zelazny* "never offered

any explanation for his delay in filing suit" after discovering the basis for his claim. *Id.* at 542. Here, by contrast, DAC has provided no evidence that Local 150 knew or should have known that it could make out a claim against DAC in 2006. Because DAC cannot provide any evidence that it knew or should have known in 2006 that DAC was subject to the requirements of the CBA as a successor to DWC, it has failed to meet its burden to establish this affirmative defense for purposes of this motion. *See Nature Conservancy v. Wilder Corp. of Del.*, 656 F.3d 646, 651 (7th Cir. 2011) (denying laches defense on motion for summary judgment where there was no evidence of undue delay or prejudice).

DAC also filed a Motion for Sanctions against Local 150 pursuant to Federal Rule of Civil Procedure 37(c), arguing that Local 150's attempted to introduce "newly discovered evidence." This evidence consisted of an affidavit that purports to establish that Local 150 representatives did not become aware of DAC's relationship to DWC until 2016. If considered, this evidence could prove fatal to the laches defense. However, given that the laches defense failed even without this affidavit, the Court denies the Motion for Sanctions as moot.

### B.  Statute of Repose

DAC next attempts to state an affirmative defense under the Illinois statute of repose. Under this statute, an action related to a construction project must be commenced "within four years from the time the person bringing an action . . . knew or should have known" about the act or omission giving rise to a cause of action. 735 ILCS 5/13-214. DAC has not established this defense for two reasons. First, DAC's brief does not develop this argument at all. It cites no case law and includes only a few lines describing this defense. DAC's failure to develop the argument means it has waived it. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("'perfunctory and underdeveloped

arguments, and arguments that are unsupported by pertinent authority are waived'"); *Graffia v. Comm'r of Internal Revenue,* 580 F. App'x 474, 477 (7th Cir. 2014) (failure to develop an argument means the argument is waived).

Second, it is unclear which demolition project DAC cites as its basis for applying the statute of repose, and DAC failed to describe the basis for this Court's application of the Illinois statute of repose. DAC claims that because this Court sits in Illinois, it must follow Illinois choice-of-law rules. (Dkt. 84 at 4.) However, that rule only applies to federal courts sitting in diversity. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). In federal question cases, federal courts apply the federal common law choice-of-law rule, which is a "most significant relationship" test derived from the Restatement (Second) of Conflict of Laws. *In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp. 747, 753 (N.D. Ill. 1996). Accordingly, if Indiana is the state that had the most significant relationship to the injury, then Indiana choice-of-law governs. The same applies for Illinois. Indiana choice-of-law rules require that courts apply the statute of repose from the state in which the alleged injury occurred. *Klein v. DePuy, Inc.*, 506 F.3d 553, 555 (7th Cir. 2007). Illinois has the same rule–"the law of the state with the most significant contacts to the dispute governs." *Perma-Pipe, Inc. v. Liberty Surplus Ins. Corp.*, 38 F. Supp.3d 890, 894 (N.D. Ill. 2014) (citation omitted). Accordingly, if the 2006 Hammond, Indiana job is the relevant project, then the ten-year Indiana repose period applies, and Local 150 filed its grievance within ten years. If the Libertyville, Illinois project is the relevant project, then the Illinois statute applies, and Local 150 filed its grievance within four years of that project. Under either scenario Local 150 filed a timely grievance. As such, DAC has failed to meet its burden to establish a statute of repose defense.

## CONCLUSION

For the reasons set forth above, the Court denies both parties' Motions for Summary Judgment [65; 67]. The Court also denies DAC's Motion for Sanctions [63].

Hon. Virginia M. Kendall
United States District Judge

Date: August 18, 2017